No. 14510

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

WILLIAM B. JAPPE and MARGARET L. JAPPE,

Plaintiffs and Respondents,

-vs-

CO-OP SUPPLY, INC., a Corporation,

Defendant and Appellant.

---

Appeal from: District Court of the Fifth Judicial District,
Honorable Frank E. Blair, Judge presiding.

Counsel of Record:

For Appellant:

Corette, Smith and Dean, Butte, Montana
R. D. Corette argued, Butte, Montana
Schulz, Davis and Warren, Dillon, Montana
Carl Davis argued, Dillon, Montana

For Respondents:

Poore, McKenzie, Roth, Robischon & Robinson, Butte,
Montana
Robert Poore argued David Wing argued, Butte, Montana

---

Submitted: May 1, 1979

Decided: SEP - 6 1979

Filed: SEP    1979

*Thomas J. Kearney* Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Plaintiffs William and Margaret Jappe sought specific performance of a 1976 contract providing for payment of commissions and an option to purchase a self-service, gas-convenience store. Co-op Supply, the defendant, has appealed a judgment for the plaintiffs entered by the Beaverhead County District Court.

This appeal raises the following issues: (1) whether the plaintiffs refused to perform their management duties called for by the 1976 contract, and if so, whether their refusal excused defendant's nonperformance of the contract; (2) whether the defendant terminated the 1976 contract by discharging the plaintiffs from their employment positions; and, (3) whether there was sufficient evidence to support the District Court order for specific enforcement of the 1976 contract provisions for payment of commissions and option to purchase.

The defendant, Co-op Supply, Inc. is the owner of petroleum plants, gas stations and convenience stores in Dillon, Montana. In 1966, William Jappe was employed as general manager of defendant's main store in Dillon, Montana. Two years later, Jappe's wife, Marge, was hired as Co-op Supply's bookkeeper. The employment of the Jappes was by oral agreement.

In 1972, the plaintiffs became interested in developing their own service station-convenience store. William Jappe developed plans for the store and negotiated a "hold" on property located in northern Dillon. He presented these plans to Co-op Supply, and Co-op Supply became interested in the project. Thereafter the "hold" on the Dillon property became a lease to Co-op Supply and William Jappe as joint lessees.

-2-

During the next four years, the parties operated under the written agreement providing that William Jappe provide the management and Co-op Supply provide the capital for the business, which was called Mini Co-op (Mini I). The agreement also stated that the Jappes should be compensated by receiving monthly gasoline commissions and an option to purchase the property should it be sold or otherwise disposed. The business was so successful that expansion was planned.

Jappes and Co-op Supply decided to build a larger store on company-owned ground. To facilitate the development of the project, the Jappes purchased land and innovated special features for the new store. The contract which governed the rights and duties of the parties towards Mini I was rewritten to pertain to the new site and to reimburse the Jappes for their cost in purchasing the site. This contract was executed on August 10, 1976. The new site is referred to as Mini II.

Mini II began operating in the fall of 1976 and the parties operated without problems under the 1976 contract until the following summer. In June 1977, a dispute arose between the Board of Directors and the Jappes concerning the size of bonuses to be paid to employees.

The dispute came to a head at a Board meeting on July 5, 1977, when the Jappes, disgusted with the Board's rejection of their recommendations concerning employee bonuses, made statements to the effect that they felt like quitting. The Board interpreted these comments as resignations. Whatever the case, in the next few days the Jappes decided to seek reinstatement of their employment positions.

At subsequent meetings unattended by the Jappes, the Board decided that reinstatement would be permitted only if the Jappes signed an agreement cancelling their prior written

-3-

agreements with Co-op Supply. On August 9, 1977, the Jappes refused to sign the cancellation agreement and the Board agreed their "resignation" was thereafter effective. Jappes left their keys at the office and departed. The following day, Marge Jappe resumed her usual bookkeeping duties at Co-op Supply's main store. She continued working until she received a letter signed by Supply's president telling her that she had been terminated. Approximately one week later, William Jappe returned to Mini II to perform his management duties but at the request of the directors he left the premises.

The Jappes were not paid any commissions on gasoline sales after August 26, 1977 and by writing on September 26, 1977, advised Co-op Supply that they elected to exercise their option. Thereafter, the Jappes instituted this suit to enforce the commission and option provisions of the 1976 contract.

The first issue raised by Co-op Supply is whether the trial court erred in concluding that the 1976 contract is valid and enforceable, and governs the rights of the parties concerning Mini II. The 1976 contract stated that it "embraced the operation and management" of Mini II and that the facility "is . . . managed by Jappe." Co-op Supply argues that the contract is not in effect because the Jappes abandoned any good faith performance of their management duties.

There is substantial evidence to support the trial court's conclusion that at all times the Jappes stood ready and willing to perform their management duties. Co-op Supply would have this Court find that the Jappes' expressions of disappointment at the July 5, 1977 meeting was a refusal to perform their duties under the 1976 contract. The trial court found that the Jappes' "resignation" related only to their employment

-4-

positions with Co-op Supply. The evidence shows that the Jappes wished to continue working at Mini II and William Jappe did resume such work until he was requested to leave. Thus, the evidence supports rather than preponderates against the trial court's finding that the Jappes were willing to continue managing Mini II.

Co-op Supply also argues that the 1976 contract was only in effect as long as the Jappes remained as employees and therefore that the contract ceased to be effective on August 9, 1977 when the Board accepted the Jappes' resignations. But, the trial court found that Co-op Supply's 1976 contract with the Jappes was not contingent upon their continued employment at the main store. The Jappes were employed by oral agreement to work at the main store while their duties at Mini II were governed by the 1976 contract which stated that Jappes' management of Mini II shall be "in addition to their other and normal duties as employees of Co-op Supply, Inc."

Additional language in the 1976 contract suggests that it was a property agreement, not an employment contract. Paragraph two of the contract provides that the Jappes shall be compensated not for their duties but for "their contribution to CO-OP SUPPLY, INC. in the matter of acquiring, promoting, developing, and establishing said Mini Co-op.. . ." This language along with the testimony of William Jappe that he understood the contract to be a form of partnership agreement is ample evidence that the contract was not dependent on the Jappes employment at Supply's main store and did not cease to be effective when Co-op Supply terminated the Jappes employment.

The next issue is whether the trial court was correct in granting the Jappes specific performance of the option to purchase Mini II. The 1976 contract stated in paragraph six that Co-op Supply agreed that if for any reason it should

-5-

ever "sell or otherwise dispose" of Mini II, that Jappes would have the exclusive option to purchase the facility. Co-op Supply contends that since it never sold the facility, and has continued to operate Mini II, that the option cannot be exercised.

The District Court held that Co-op Supply had wrongfully ousted the Jappes from their position as managers of Mini II, and that this wrongful oust was a "disposal" of the premises which triggered the operation of the Jappes' option rights. The court concluded that the contractual wording "sell or otherwise dispose" is ambiguous and therefore looked to the surrounding circumstances as permitted by section 28-3-402, MCA. We cannot hold as a matter of law that the language was clear by its very tenor; therefore, it was proper for the trial court to consider the surrounding circumstances.

The circumstances surrounding the execution of the contract support the trial court's conclusion that the Jappes intended Mini II to be a joint venture with Co-op Supply. The "sell or otherwise dispose" clause was inserted at William Jappe's insistence to protect his property interest in Mini II, in the event that Co-op Supply should release him from his position as Mini II manager. On the other hand, construction offered by Co-op Supply towards the language "sell or otherwise dispose" is not clear. Although the 1976 contract was signed by Co-op Supply's president, Peter Rebish, it was not read or discussed by the Board members prior to July 5, 1977. Based on this evidence, we cannot say that the evidence clearly preponderates against the construction of the language reached by the District Court.

The final issue is whether the Jappes are entitled to any unpaid gasoline commissions under the 1976 contract. Co-op

Supply has failed to pay the Jappes any commissions since August 26, 1977. The trial court ordered Co-op Supply to pay commissions for the period between August 26, 1977 and the date when the Jappes obtained possession of Mini II from Co-op Supply.

The contract provides that the Jappes shall "during the term of the agreement" be compensated by receiving gasoline commissions. The contract does not set out definite dates for the term of the agreement but it provides that the "agreement shall remain in full force and effect until terminated by written agreement of the parties. . ." It is undisputed that the contract has not been terminated by written agreement. As already discussed, there is ample evidence to support the trial court's finding that the contract was not terminated by Co-op Supply's firing of the Jappes or by any action on the part of the Jappes. Therefore, the trial court was correct in finding that the contract is in full force and effect and that the Jappes are entitled to commissions.

The judgment of the District Court is affirmed.

_____
                    Justice

We Concur:

_____
            Chief Justice

_____

_____
                    Justices

Mr. Justice John Conway Harrison dissenting:

I dissent. First, I find the findings of fact and conclusions of law and opinion reached by the trial court both difficult to understand and contrary to the evidence as I view it.

The evidence, as I see it, clearly showed that the Jappes quit their positions due to their disagreements with the Board. Mr. Jappe quit on a disagreement over policy of pay to certain employees. Such policymaking decisions are a major function of the Board, and it is evident that Mr. Jappe was attempting to go beyond his power as a paid employee of Co-op Supply. His duties were to recommend certain operations of Co-op, but not to set policy. Too, the fact that he was drinking and was abusive to his employers was reason enough to fire him. The Jappes, both by their oral statements, acts and conduct, clearly abandoned any good faith performance of their agreements with Co-op Supply. They did not perform their managerial duties with the loyalty and faithfulness expected. See Garden City Floral v. Hunt (1953), 126 Mont. 537, 255 P.2d 352; 53 Am.Jur.2d Master and Servant §§101-103.

As I view the evidence, Mr. Jappe's employment was that of general manager of all of the Co-op facilities, which included the service station, the Mini facility, the bulk and oil business, the proposed business and Key-Trol Station, and all branch facilities of Co-op Supply in Dillon. The District Court noted in its memorandum that "[w]hen we say plaintiffs were fired on August 9, [1977], we refer to their employment at the Service Station across the street from the County Courthouse at which they were employed under an oral, month to month, contract."

Thereafter, the District Court attempted to treat the resignation and subsequent discharge as being solely related to the positions of manager and bookkeeper of Co-op Supply and having nothing to do with the present suit on the Mini contract. The District Court then treats the resignation and discharge as "part of the series of events which became the triggering mechanisms for the wrongful actions of Co-Op Supply in endeavoring to force and pressure the Jappes into relinquishing all property rights" under the Mini contract. I do not understand how the court arrived at this decision which allows Jappe, after resignation and discharge from managing Co-op Supply's other business, to remain as manager of the Mini facility. I can find no reason to allow the Jappes to continue under the Mini contract when they had violated their fiduciary duties and obligations to Co-op Supply.

I would reverse and dismiss the cause.

John Conway Harrison
Justice